**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

ERIC H. TALBERT and JONATHAN BURDZY,  :
On behalf of themselves and other similarly  :
situated persons  :
                Plaintiffs,  :
  :
             v.  :     Civil No. 2:19-cv-05010-JMG
  :
AMERICAN WATER WORKS COMPANY,  :
INC., *et al.,*  :
            Defendants.  :

---

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                            **May 7, 2021**

      Plaintiff Jonathan Burdzy, a customer of New Jersey American Water Company (NJAWC), discovered contaminants in the water supply of his New Jersey home. So too did Plaintiff Eric Talbert, a Pennsylvania resident and customer of Pennsylvania-American Water Company (PAWC). Both now bring claims on behalf of themselves and a putative nationwide class against NJAWC, PAWC, the holding company, American Water Works Company, Inc. (AWWC), and its Tennessee subsidiary, Tennessee American Water Company (TAWC). Talbert also brings claims against all entities because of a house flood that he suffered at the hands of a "water hammer"—a surge in water pressure that can occur when, for example, a fire department shuts down a nearby hydrant too quickly.

      Before the Court are Defendants' motions to dismiss. Defendants seek dismissal on several grounds, most of which the Court finds persuasive. For the reasons explained below, we find that: (1) Plaintiffs lack standing to sue TAWC; (2) Plaintiffs also lack standing to represent a nationwide class; (3) we lack personal jurisdiction over NJAWC and AWWC; (4) the primary jurisdiction

doctrine warrants abstention on Count III; (5) Talbert's "water hammer" claims are properly before the Pennsylvania Public Utility Commission (PUC) in the first instance; and (6) Counts I and II do not set forth cognizable claims. Accordingly, Defendants' motions are granted in part and denied in part.

## I.  BACKGROUND

Given the complexity of this case, we first summarize Plaintiffs' factual allegations before describing the federal and state regulatory schemes at issue.

### A.  Factual Allegations[1]

#### i.  Eric Talbert

Plaintiff Eric Talbert has been a PAWC customer since at least 2017.  Am. Compl. ¶¶ 1, 71, ECF No. 16 [hereinafter "Am. Compl."].  PAWC manages the Royersford water distribution system, which supplies Talbert's home with tap water.  *Id.* ¶¶ 11, 15.

On October 25, 2017, a "water hammer" caused Talbert's house to flood.  *Id.* ¶ 71.  "Water flooded down into the ceiling of the basement and garage," and Talbert sought recourse from PAWC.  *Id.*  After PAWC's insurer, Travelers' Insurance, performed an investigation, it determined that the flood "resulted from the fire department using a fire hydrant . . . .  A water hammer was created by the fire department when they apparently shut the hydrant down too quickly."  *Id.* ¶ 72.

Believing that "PAWC failed to protect" his home from the flood, Talbert decided to collect a sample of his tap water after PAWC's next scheduled flushing of the Royersford system.  *Id.* ¶¶ 15, 73.  About one week after PAWC flushed the system in April 2018, Talbert sent a sample of his tap water to an independent lab for testing.  *Id.* ¶ 15.  To Talbert's surprise, his tap water contained

---

[1]     This summary is based on the allegations contained in the Complaint.  For purposes of this discussion, we "accept as true the allegations in the complaint and its attachments, as well as reasonable inferences construed in the light most favorable to the plaintiffs."  *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) (internal citation omitted).

2 parts per billion (ppb) of tetrachloroethylene;[2] 0.013 parts per million (ppm) of nickel; and 0.32 milligrams per liter (mg/L) of iron.[3] *Id.* ¶¶ 16, 31, 34.

The test results were particularly unexpected because they conflicted with a report that appeared on AWWC's website. *Id.* ¶ 11. The report, which provided testing results for the Royersford system for the 2018 calendar year (the "2018 Royersford Water Quality Report"), claimed to show "what substances were detected in your drinking water during 2018." *Id.* ¶ 12. While it noted that the Royersford system contained up to 0.14 mg/L of iron,[4] absent from the report were any mentions of tetrachloroethylene or nickel. *Id.* ¶¶ 17, 31, 33.

Upon the filing of this lawsuit, AWWC pulled the 2018 Royersford Water Quality Report from its website. *Id.* ¶ 23.

### ii. Jonathan Burdzy

Plaintiff Jonathan Burdzy has been a NJAWC customer since at least 2019. *Id.* ¶¶ 2, 55. NJAWC manages the Western water distribution system, which supplies Burdzy's home with tap water. *Id.* ¶¶ 54–55.

In November 2019, Burdzy sent a sample of his tap water to an independent lab for testing. *Id.* ¶ 55. Burdzy's water contained 0.06 ppm of zinc; 0.06 ppm of boron; 24.29 ppm of sulfate; and 0.51 ppm of copper. *Id.* ¶¶ 56–60.

As with the Royersford system, AWWC's website reported contaminants found in the Western system during the 2019 calendar year (the "2019 Western System Water Quality Report").

---

[2] Tetrachloroethylene is a carcinogen typically used to dry clean clothes. *See* Am. Compl. ¶¶ 18–20.

[3] Talbert makes a passing reference to another test of his tap water that he commissioned in August 2018. *Id.* ¶ 34. This second test revealed 0.267 mg/L of iron in his tap water. *Id.*

[4] Plaintiffs allege that this data was included in an accompanying document entitled "Typical Water Quality Information." *Id.* ¶ 33.

*Id.* ¶¶ 11, 55.  While it noted that the Western system contained 0.313 ppm of copper, absent from the report were any mentions of zinc, boron, or sulfate.  *Id.* ¶¶ 56–60.

### B.    Federal and State Regulations

#### i.    Federal Regulations

Before water reaches the tap, it must meet a series of regulatory standards promulgated by federal and state governments.  At the federal level, Congress passed the landmark Safe Drinking Water Act (SDWA) in 1974, which "has resulted in the development of national primary drinking water regulations for specific contaminants . . . .  It also authorizes the EPA to regulate filtration, disinfection, self-monitoring, and reporting for public drinking water systems."  1 L. OF ENVTL. PROT. § 9:258 (2020).

The national primary drinking water regulations set limits—called maximum contaminant levels (MCLs)—and "nonenforceable health goals"—called maximum contaminant level goals (MCLGs)—for contaminants.  *See* 40 C.F.R. § 141.2 (2019).  The former are defined as the "maximum permissible level of a contaminant in water which is delivered to any user of a public water system."  *Id.*  The latter are defined as the "maximum level of a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons would occur, and which allows an adequate margin of safety."  *Id.*

"Each community water system must provide to its customers an annual report" that details, among other things, the presence of contaminants in the system.  *Id.* § 141.153(a).  The data in these "Consumer Confidence Reports" (CCRs) is collected according to certain standards.  *See, e.g.*, *id.* §§ 141.21–141.29.  In surface water systems, for example, samples of organic chemicals (like tetrachloroethylene) can be collected "at each entry point to the distribution system after treatment." *Id.* § 141.24(f)(2).  And when compliance with MCLs is determined annually, the CCR must report the "highest detected level [of the relevant contaminant] at any sampling point" within the system.

*Id.* § 141.153(d)(4)(iv)(A).

The EPA has not provided MCLs or MCLGs for all of the contaminants identified by

Talbert and Burdzy. As set forth in the table below, there is no MCL for nickel, iron, zinc, boron,

or sulfate:[5]

| Contaminant | MCL | MCLG | Plaintiffs' Allegations |
|---|---|---|---|
| Tetrachloroethylene | 0.005 ppm | 0 ppm | 0.002 ppm (Talbert's water) |
| Nickel | N/A | N/A | 0.013 ppm (Talbert) |
| Iron | N/A | N/A[6] | 0.267–0.32 ppm (Talbert) |
| Zinc | N/A | N/A[7] | 0.06 ppm (Burdzy's water) |
| Boron | N/A | N/A | 0.06 ppm (Burdzy) |
| Sulfate | N/A | N/A[8] | 24.29 ppm (Burdzy) |
| Copper | 1.3 ppm[9] | 1.3 ppm | 0.51 ppm (Burdzy) |

[5]    *See* 40 C.F.R. § 141.61(a) (maximum contaminant levels for organic contaminants); *id.* § 141.62 (maximum contaminant levels for inorganic contaminants); *id.* § 141.50 (maximum contaminant level goals for organic contaminants); *id.* § 141.51 (maximum contaminant level goals for inorganic contaminants); *id.* § 141.80(c)(2) (requirements for regulation of copper). These regulations measure MCLs and MCLGs in milligrams per liter. For ease of comparison, we use parts per million.

[6]    In addition to the national primary drinking water regulations, the EPA has established national secondary drinking water regulations. "The EPA recommends water systems meet its Secondary Drinking Water Regulations but does not require they do so." Am. Compl. ¶ 32. The regulations provide secondary maximum contaminant levels (SMCLs), "guidelines to assist public water systems in managing their drinking water for aesthetic considerations, such as taste, color, and odor. These contaminants are not considered to present a risk to human health at the SMCL." EPA, *Secondary Drinking Water Standards: Guidance for Nuisance Chemicals*, https://www.epa.gov/sdwa/secondary-drinking-water-standards-guidance-nuisance-chemicals (last visited Apr. 24, 2021). The SMCL for iron is 0.3 ppm. *See* 40 C.F.R. § 143.3. (As with the MCLs and MCLGs, the SMCLs are measured in milligrams per liter. For ease of comparison, we use parts per million.)

[7]    The SMCL for zinc is 5 ppm. *See* 40 C.F.R. § 143.3.

[8]    The SMCL for sulfate is 250 ppm. *Id.*

[9]    This upper limitation on copper is not styled as a "maximum contaminant level." The EPA has issued special regulations for lead and copper (the "Lead and Copper Rule"), which took effect in 1992. *See generally State of Neb. ex. rel. Stenberg v. United States*, 238 F.3d 946 (8th Cir. 2001). These regulations require treatment of water systems with copper levels greater than 1.3 ppm. *See* 40 C.F.R. §§ 141.80(c)–(e). The 1.3 ppm threshold is called the "copper action level." *Id.*

###### ii.     Pennsylvania and New Jersey Regulations

States play an indispensable role in achieving the SDWA's mission.  Indeed, the SDWA "established the current federal-state arrangement in which states may be delegated primary implementation and enforcement authority for the drinking water program."  MARY TIEMANN, CONG. RSCH. SERV., RL31243, SAFE DRINKING WATER ACT (SDWA): A SUMMARY OF THE ACT AND ITS MAJOR REQUIREMENTS 1 (2017).

Pennsylvania and New Jersey are two such states.  Pennsylvania achieved the "sole authority to implement the Federal Safe Drinking Water Act within its jurisdiction" when it passed the Pennsylvania Safe Drinking Water Act in 1984.  *Pickford v. Pub. Util. Comm'n*, 4 A.3d 707, 710 n.4 (Pa. Commw. Ct. 2010); *see also* 35 PA. STAT. AND CONS. STAT. ANN. § 721.2(a)(3) (West 2021) ("It is in the public interest for the Commonwealth to assume primary enforcement responsibility under the Federal Safe Drinking Water Act.").  "[T]he task of preserving water quality and monitoring for contaminants is within the authority" of the Pennsylvania Department of Environmental Protection (PADEP).  *Polites v. Pa. Pub. Util. Comm'n*, 928 A.2d 388, 391 (Pa. Commw. Ct. 2007); *see also* 35 PA. STAT. AND CONS. STAT. ANN. § 721.5 (West 2021).  Likewise, New Jersey "adopted the national primary drinking water regulations," and the New Jersey Department of Environmental Protection (NJDEP) "enforce[s] the drinking water requirements." *N.J. Dep't of Env't Prot. v. Cheyenne Corp.*, No. A-4547-15T4, 2017 WL 4848382, at *4 (N.J. Super. Ct. App. Div. Oct. 27, 2017); *see also* N.J. STAT. ANN. § 58:12A-4 (West 2021).[10]

###### a.     Pennsylvania Public Utility Commission

Talbert's claims (specifically, Counts IV–V) also implicate the Pennsylvania Public Utility

---

[10]     Pennsylvania and New Jersey also regulate the contents of CCRs.  *See, e.g.*, 25 PA. CODE § 109.416 (2021); N.J. ADMIN. CODE § 7:10-5.2(b) (2021).

Commission (PUC). In Pennsylvania, "[e]very public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities." 66 PA. STAT. AND CONS. STAT. ANN. § 1501 (West 2021). "Such service and facilities shall be in conformity with the regulations and orders of the [PUC]," *id.*, which "'has long been recognized as the appropriate forum for the adjudication of issues involving the reasonableness, adequacy and sufficiency of public utility services.'" *MCI Telecomms. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1103 (3d Cir. 1995) (quoting *Behrend v. Bell Tel. Co. of Pa.*, 243 A.2d 346, 347 (Pa. 1968)). Public utilities like PAWC must file tariffs with the PUC that are "binding and dispositive of the rights and liabilities between the customer and the public utility." *Id.* (internal citation omitted); *see also* 66 PA. STAT. AND CONS. STAT. ANN. §§ 1302–1303 (West 2021). "The PUC has enforcement power over its tariffs and regulations, and matters that pertain to those tariffs are considered to be within the particular expertise of the PUC." *MCI*, 71 F.3d at 1103 (internal citations omitted); *see, e.g.*, 66 PA. STAT. AND CONS. STAT. ANN. § 501 (West 2021).

To that end, PAWC initiated a proceeding before the PUC during the pendency of this suit (the "PUC Proceeding").[11] PAWC's petition asks the PUC to declare "that [PAWC] complied with [the] Public Utility Code, PUC regulations and orders, and the PAWC Tariff with respect to Mr. Talbert's allegations in Counts Four and Five." Defs.' Mot. 25, ECF No. 17 [hereinafter "Defs.' Mot."].

---

[11]     *See* Am. Pet., *In re Pet. of Pennsylvania-American Water Co.* (No. P-2020-3018499), https://www.puc.pa.gov/pcdocs/1668838.pdf. We are able to take judicial notice of this petition. *See, e.g.*, *Gibson v. Pa. Pub. Util. Comm'n*, No. 1:15-cv-00855, 2015 WL 3952777, at *1 n.2 (M.D. Pa. June 18, 2015) (taking judicial notice of an online case docket for PUC proceedings).

## II.    DISCUSSION

Talbert and Burdzy now allege that the Defendants violated the New Jersey Consumer Fraud Act (NJCFA) by publishing misleading CCRs.  They also assert breach of contract and negligence claims against all Defendants.

In broad strokes, Defendants respond that: (1) Plaintiffs lack standing; (2) we lack personal jurisdiction over NJAWC and AWWC; (3) we should refer Plaintiffs' claims to the PADEP, NJDEP, or PUC on primary jurisdiction grounds; (4) Plaintiffs fail to state cognizable claims; and (5) we should strike the class allegations.  We consider these arguments in turn.

### A.    Standing

"A motion to dismiss for want of standing is . . . properly brought pursuant to [Federal] Rule [of Civil Procedure] 12(b)(1)."  *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014) (internal quotation marks and citation omitted).  When faced with such a motion, we must first determine whether it presents a "facial" or "factual" attack.  The former "is an argument that considers a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the court."  *Id.* at 358.  The latter "is an argument that there is no subject matter jurisdiction because the facts of the case . . . do not support the asserted jurisdiction."  *Id.*  In evaluating a facial attack, we apply the Rule 12(b)(6) standard of review; that is, we accept the Complaint's well-pleaded allegations as true and draw all reasonable inferences in the Plaintiffs' favor.  *Id.*  By contrast, a factual attack allows us to examine evidence outside the pleadings.  *Id.*

We also have a "continuing obligation" to raise any standing issues sua sponte.  *Seneca Res. Corp. v. Twp. of Highland*, 863 F.3d 245, 252 (3d Cir. 2017) (internal quotation marks and citation omitted).  Therefore, we begin by noting that neither Talbert nor Burdzy has standing to sue TAWC.  Indeed, there is *no named plaintiff* before us who has allegedly suffered an injury at the hands of TAWC.  *See, e.g.*, *6803 Boulevard E., LLC v. DIRECTV, LLC*, 17 F. Supp. 3d 427, 432

(D.N.J. 2014) ("Because the parties agree that no named plaintiff has suffered injury at the hands of [defendant], no named plaintiff has standing to pursue claims against [defendant]."). That this is a putative nationwide class action under Rule 23 adds nothing to the analysis, despite Plaintiffs' contentions to the contrary. *See, e.g.*, Pls.' Opp'n 11, ECF No. 18 [hereinafter "Pls.' Opp'n"]. "'[W]hether or not Rule 23 would permit a plaintiff to represent a class against non-injurious defendants cannot affect the plaintiff's Article III standing to sue the non-injurious defendants.'" *Rabin v. NASDAQ OMX PHLX LLC*, 182 F. Supp. 3d 220, 229 (E.D. Pa. 2016) (quoting *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012)); *see also Polanco v. Omnicell, Inc.*, 988 F. Supp. 2d 451, 464 (D.N.J. 2013) ("[N]amed plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." (internal quotation marks and citation omitted)). For that reason, we dismiss all claims against TAWC for lack of standing. This dismissal is without prejudice. *See Cottrell v. Alcon Laboratories*, 874 F.3d 154, 164 n.7 (3d Cir. 2017).

We now turn to Defendants' first standing argument—that Plaintiffs lack standing to bring NJCFA claims against AWWC and PAWC. *See* Defs.' Mot. 14–15. This, like all of Defendants' standing arguments, is a facial attack on the Complaint. *See, e.g.*, *Machon v. Pa. Dep't of Pub. Welfare*, 847 F. Supp. 2d 734, 743 (E.D. Pa. 2012) ("As Defendants have not filed an answer, their motion is necessarily a facial attack."). But this first argument is more a statutory standing issue than an Article III standing issue. *See, e.g.*, *Wallach v. Eaton Corp.*, 837 F.3d 356, 363 n.9 (3d Cir. 2016) (entertaining a "statutory standing challenge as a 12(b)(1) Article III challenge" is procedural error); *Miller v. Samsung Elecs. Am., Inc.*, No. 14-4076, 2015 WL 3965608, at *3 (D.N.J. June 29, 2015) ("[W]hether an injured Plaintiff can bring a claim under the laws of a state in which he does not reside is not a question of Article III constitutional standing, but rather a non-jurisdictional

question of statutory standing." (citing *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 886 (E.D. Pa. 2012)). Whether Plaintiffs have standing to invoke the NJCFA against PAWC, an entity with no connection to New Jersey,[12] and AWWC, a mere holding company,[13] is better examined in the 12(b)(6) context, which we do below.

Defendants next argue that, "[t]o the extent plaintiffs suggest they were harmed by drinking water that complies with all applicable safe drinking water regulations, they have not suffered an injury in fact." Defs.' Mot. 21 n.15. Article III standing is comprised of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Defendants key in on the injury-in-fact requirement, which is "very generous to claimants, demanding only that the claimant allege[] some specific, identifiable trifle of injury." *Cottrell*, 874 F.3d at 162 (internal quotation marks and citation omitted). "Monetary harm is a classic form of injury-in-fact," and that is exactly what Plaintiffs have alleged here. *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir. 2005) (internal citation omitted). Plaintiffs had "to buy water filters" as a result of Defendants' conduct, which is sufficient to confer Article III standing. Am. Compl. ¶ 35; *see also Danvers*, 432 F.3d at 293.

Defendants finally argue that "plaintiffs lack standing to bring claims on behalf of a class against any entity other than PAWC or NJAWC under the laws of any State other than Pennsylvania or New Jersey." Defs.' Mot. 34. We agree that Plaintiffs cannot assert claims under

---

[12]    PAWC is a Pennsylvania corporation with its principal place of business in Pennsylvania. Am. Compl. ¶ 3.

[13]    AWWC is a Delaware corporation with its principal place of business in New Jersey. *Id.* ¶ 4.

the laws of any state other than Pennsylvania or New Jersey. Plaintiffs respond that this issue "will have to wait until . . . class certification," Pls.' Opp'n 34, but this proposal "would allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union. . . . That would present the precise problem that the limitations of standing seek to avoid." *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 155 (E.D. Pa. 2009). We therefore decline to table this issue until class certification. Plaintiffs have suffered alleged injuries under Pennsylvania and New Jersey law, so they do not have standing to assert state law claims under the laws of any other states. *See, e.g.*, *Xi Chen Lauren v. PNC Bank, N.A.*, 296 F.R.D. 389, 391 (W.D. Pa. 2014) (holding that the named plaintiff in a putative nationwide class action, who suffered an injury under Ohio law, "does not have standing to assert . . . claims under the law(s) of any other state"); *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, No. 12-169, 2013 WL 5503308, at *11 (D.N.J. Oct. 2, 2013) ("[T]his Court agrees that named plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury.").

### B. Personal Jurisdiction

Rule 12(b)(2) governs motions to dismiss for lack of personal jurisdiction. "If an issue is raised as to whether a court lacks personal jurisdiction over a defendant, the plaintiff bears the burden of showing that personal jurisdiction exists." *Marten v. Godwin*, 499 F.3d 290, 295–96 (3d Cir. 2007) (citing *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001)). In reviewing a Rule 12(b)(2) motion, we "must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002) (internal quotation marks and citation omitted). But because these motions "require[] resolution of factual issues outside the pleadings," *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61,

66 n.9 (3d Cir. 1984), we also "consider any affidavits submitted by the parties." *Rosso-Gana v. McDonald's Rest.*, No. 15-2016, 2015 WL 3444317, at *1 (E.D. Pa. May 28, 2015) (internal citation omitted).

Before exercising personal jurisdiction over a defendant, statutory authorization to serve process on that defendant must exist. *See Omni Capital Intern., Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987). Pennsylvania law controls this analysis, as "[a] federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state." *Rossi v. Mauli*, No. 08-3380, 2009 WL 10687674, at *1 (E.D. Pa. Apr. 7, 2009) (internal quotation marks and citation omitted). Pennsylvania's long-arm statute permits the exercise of personal jurisdiction "to the fullest extent allowed under the Constitution of the United States." 42 PA. STAT. AND CONS. STAT. ANN. § 5322(b) (West 2021); *see also Neopart Transit, LLC v. CBM N.A. Inc.*, 314 F. Supp. 3d 628, 643 (E.D. Pa. 2018) ("The statute permits the Pennsylvania courts to exercise personal jurisdiction over nonresident defendants to the constitutional limits of the Due Process Clause of the Fourteenth Amendment to the United States Constitution." (internal citations omitted)). "Thus, the question here is whether personal jurisdiction may be asserted without violation of the Defendants' due process rights, which protect an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations." *Hickman v. TL Transp., LLC*, 317 F. Supp. 3d 890, 893 (E.D. Pa. 2018) (internal quotation marks and citation omitted).

Our inquiry centers on Defendants' connections to Pennsylvania, which can manifest in the form of general or specific personal jurisdiction. *See Walden v. Fiore*, 571 U.S. 277, 284 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). General personal jurisdiction is premised on "the defendant's 'continuous and systematic' contacts with the forum and exists even if the plaintiff's cause of action arises from the defendant's non-forum related

activities." *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001) (quoting *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*, 75 F.3d 147, 151 n.3 (3d Cir. 1996)). "For a corporation, the paradigm forum for the exercise of general jurisdiction is . . . one in which the corporation is fairly regarded as at home." *Neopart*, 314 F. Supp. 3d at 643 (internal quotation marks omitted). A corporation is "at home" in its place of incorporation and its principal place of business. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014); *see also Chavez v. Dole Food Co.*, 836 F.3d 205, 223 (3d Cir. 2016) ("[I]t is incredibly difficult to establish general jurisdiction [over a corporation] in a forum other than the place of incorporation or principal place of business." (internal quotation marks and citation omitted)).

"Specific jurisdiction, on the other hand, exists when the defendant has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Neopart*, 314 F. Supp. 3d at 643 (internal quotation marks and citation omitted). Three factors dictate whether we can exercise specific personal jurisdiction over a corporation: "(1) whether the defendant purposefully directed its activities at the forum state; (2) whether the litigation arises out of or relates to at least one of those activities; and (3) whether the existence of jurisdiction otherwise comports with fair play and substantial justice." *Id.* at 644 (internal quotation marks and citation omitted).

Defendants correctly argue that we lack personal jurisdiction over NJAWC. We cannot exercise general personal jurisdiction over NJAWC because it is a New Jersey corporation with its principal place of business in New Jersey. *See* Albrecht Decl. ¶ 3, ECF No. 17-8 [hereinafter "Albrecht Decl."].[14] Burdzy is the only plaintiff with any connection to NJAWC, and his

---

[14]     Plaintiffs instead allege that NJAWC is incorporated in Delaware. Am. Compl. ¶ 5. Even if that were the case, it would not change our conclusion that NJAWC is not "at home" in Pennsylvania.

allegations center on conduct that occurred entirely in New Jersey. *See, e.g.*, Am. Compl. ¶¶ 2, 54–55. In sum, there is no indication that NJAWC directed *any* activities toward Pennsylvania. Rather, "NJAWC does not manufacture, distribute, sell, supply, or install any products in Pennsylvania, and does not provide any other relevant services within Pennsylvania." Albrecht Decl. ¶ 11. For this reason, we dismiss (without prejudice) all claims against NJAWC for lack of personal jurisdiction.[15]

Similar logic compels dismissal of the claims against AWWC. We cannot exercise general personal jurisdiction over AWWC because it is a Delaware corporation with its principal place of business in New Jersey. *See* Am. Compl. ¶ 4; Merante Decl. ¶ 3, ECF No. 17-7 [hereinafter "Merante Decl."]. We also cannot exercise specific personal jurisdiction over AWWC because it does not "perform any services in Pennsylvania;" "negotiate, enter into, or perform contracts in Pennsylvania;" "manufacture, distribute, sell, supply, or install any products in Pennsylvania;" or "own, use, or possess any real property in Pennsylvania." Merante Decl. ¶¶ 20–23. "AWWC does not use the corporate vehicle as a conduit to operate PAWC," *id.* ¶ 5, and the "general rule" is that the "mere ownership of a subsidiary does not subject the parent corporation to personal jurisdiction in the state of the subsidiary." *Action Mfg. Co., Inc. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411, 420 (E.D. Pa. 2005).

Faced with AWWC's declaration, Plaintiffs "rely on the bare pleadings alone," *Action Mfg.*, 375 F. Supp. 2d at 418 (internal quotation marks and citation omitted), and fail to "prov[e] by

---

[15] Plaintiffs incorrectly contend that we have jurisdiction over NJAWC because "Plaintiff Talbert seeks to represent a class of customers all wronged by Defendants' policies." Pls.' Opp'n 11. Plaintiffs' decision to bring a class action does not change our personal jurisdiction analysis. Indeed, "it is the *named plaintiff's* claim that must arise out of or result from the defendant's forum-related activities, *not the claims of the unnamed members of the proposed class*, who are not party to the litigation absent class certification." *Chernus v. Logitech, Inc.*, No. 17-673(FLW), 2018 WL 1981481, at *3 (D.N.J. Apr. 27, 2018) (emphasis added) (internal quotation marks and citation omitted). Neither Talbert's claims nor Burdzy's claims arise out of or result from NJAWC's Pennsylvania-related activities.

affidavits or other competent evidence that jurisdiction is proper." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (internal quotation marks and citation omitted). This is insufficient to defeat the motion to dismiss. *See, e.g.*, *Lionti v. Dipna, Inc.*, No. 17-01678, 2017 WL 2779576, at *1 (E.D. Pa. June 27, 2017) ("The plaintiff must respond to the defendant's motion with actual proofs . . . ." (internal quotation marks and citation omitted)); *Deardorff v. Cellular Sales of Knoxville, Inc.*, No. 19-2642-KSM, 2020 WL 5017522, at *2 (E.D. Pa. Aug. 25, 2020) (collecting cases). Plaintiffs' bare allegations—that AWWC is "an active participant" in its Pennsylvania subsidiary's decision "to omit from water quality reports both regulated and unregulated contaminants"—do not pass muster. *See* Pls.' Opp'n 13; Am. Compl. ¶ 82. "Once the plaintiff's allegations are contradicted by an opposing affidavit," as they were here, the plaintiff "must present similar evidence in support of personal jurisdiction." *Katz v. DNC Servs. Corp.*, No. 16-5800, 2017 WL 5885672, at *2 (E.D. Pa. Nov. 29, 2017) (internal quotation marks and citation omitted); *see also Liontl*, 2017 WL 2779576, at *1 ("[T]he plaintiff must present competent evidence, such as sworn affidavits, to support its jurisdictional allegations." (internal quotation marks and citation omitted). Plaintiffs have not met this burden, so we dismiss (without prejudice) all claims against AWWC for lack of personal jurisdiction.[16]

We are mindful that "if the plaintiff's claim is not clearly frivolous [as to the basis for personal jurisdiction], the district court should ordinarily allow discovery on jurisdiction." *Metcalfe*, 566 F.3d at 336 (internal quotation marks and citation omitted); *see also Toys "R" Us,*

---

[16]     Plaintiffs also argue that "AWWC always moves to be dismissed from complaints arguing no court has jurisdiction over it other than Delaware where it is incorporated or New Jersey where its principal place of business is located." Pls.' Opp'n 12. That may be the case, but the precedent they cite, *Good v. Am. Water Works Co.*, No. 2:14-01374, 2015 WL 1600761 (S.D.W. Va. Apr. 9, 2015), is distinguishable. There, AWWC moved to dismiss under Rule 12(b)(2), but the plaintiffs survived the motion by responding with competent evidence that AWWC engaged in "direct contact" with the forum. *Id.* at *4–6. Plaintiffs have not offered similar evidence here.

*Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) ("[C]ourts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.'" (citing *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997)). Here, however, Plaintiffs have not presented "factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts between [the party] and the forum state." *Toys "R" Us*, 318 F.3d at 456 (internal quotation marks and citation omitted). We therefore exercise our discretion "by not allowing plaintiffs to conduct limited discovery in the hopes that it may uncover some evidence supporting jurisdiction; discovery should not be used as a fishing expedition." *Arch v. Am. Tobacco Co., Inc.*, 984 F. Supp. 830, 841 (E.D. Pa. 1997); *see also LG Elecs., Inc. v. ASKO Appliances, Inc.*, No. 08-828, 2009 WL 1811098, at *3 (D. Del. June 23, 2009) ("[U]nsubstantiated speculation is insufficient to warrant jurisdictional discovery."); *Garshman v. Universal Res. Holding, Inc.*, 641 F. Supp. 1359, 1366 (D.N.J. 1986) ("In light of [defendant's] status as a regulated holding company and the utter absence of any hint that [defendant] controls [the subsidiary's] operations, this court must categorize [the] contention that [defendant] 'transacts business' in this district as clearly frivolous.").

### C.       Primary Jurisdiction

All that remain are Plaintiffs' claims against PAWC. PAWC asks that we dismiss or stay all of these claims on primary jurisdiction grounds.

"The doctrine of primary jurisdiction, despite its name, does not implicate the jurisdiction of a federal court. Rather, it is a principle of judicial administration designed to achieve coordination between administrative agencies and the courts." *P.R. Mar. Shipping Auth. v. Valley Freight Sys., Inc.*, 856 F.2d 546, 549 (3d Cir. 1988) (citing *Cheyney State Coll. Fac. v. Hufstedler*, 703 F.2d 732, 736 (3d Cir. 1983)). The doctrine allows us to "refer a matter to the relevant agency whenever enforcement of the claim requires the resolution of issues which have been placed within the special

competence of an administrative body." *U.S. ex rel. Int'l Brotherhood of Elec. Workers, Loc. Union No. 98 v. Farfield Co.*, No. 09-4230, 2017 WL 4269048, at *5 (E.D. Pa. Sept. 26, 2017) (internal quotation marks and citation omitted).

Four factors—called *Baykeeper* factors—determine whether we should refer a matter to an administrative agency:

> (1) Whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) Whether the question at issue is particularly within the agency's discretion; (3) Whether there exists a substantial danger of inconsistent rulings; and (4) Whether a prior application to the agency has been made.

*Baykeeper v. NL Indus.*, 660 F.3d 686, 691 (3d Cir. 2011). If these factors point toward application of the doctrine, "a court will either dismiss the matter without prejudice or stay its proceedings in order to give the parties a reasonable opportunity to refer the matter to an agency for an administrative ruling." *Int'l Brotherhood*, 2017 WL 4269048, at *5.

We first examine whether we should refer Counts I–III to the PADEP before analyzing the relationship between Counts IV–V and the PUC.

### i. Counts I–III

PAWC contends that the *Baykeeper* factors justify referral of Counts I–III to the PADEP, Defs.' Mot. 22–24, while Plaintiffs argue that we cannot apply the primary jurisdiction doctrine because "the Amended Complaint seeks damages." Pls.' Opp'n 25–26. We find that the negligence claim (Count III) should be referred to the PADEP, and further note that Plaintiffs' concerns about damages are unfounded.

At first glance, Counts I–III appear to raise issues within the conventional experience of federal courts. That is certainly the case as to Counts I and II, which are run-of-the-mill consumer

fraud and breach of contract claims.[17] *Cf. Dukich v. IKEA US Retail LLC*, No. 20-2182, 2021 WL 131284, at *4 (E.D. Pa. Jan. 14, 2021) (recognizing that the court is "well-suited" for determining whether a defendant violated Pennsylvania's consumer protection law); *Pace Membership Warehouse, Inc. v. U.S. Sprint Commc'ns Co. Ltd. P'ship*, No. 90-F-2121, 1991 U.S. Dist. LEXIS 19788, at *6 (D. Colo. Feb. 8, 1991) ("[W]hen the cause of action is one for simple breach of contract, primary jurisdiction is neither is neither necessary nor appropriate." (internal citation omitted)).

By contrast, Count III sounds in negligence, but "determination of this [claim] is dependent on the interpretation and application of . . . Pennsylvania [environmental] statutes and regulations."[18] *Harshbarger v. Pa. Mut. Life Ins. Co.*, No 12-6172, 2014 WL 1409445, at *3 (E.D. Pa. Apr. 11, 2014); *cf. Ferrare v. IDT Energy, Inc.*, No. 14-4658, 2015 WL 3622883, at *3 (E.D. Pa. June 10, 2015) (rejecting plaintiff's assertion that "[t]he questions at issue relate to a simple breach of contract claim," and staying case under the primary jurisdiction doctrine). Whether PAWC violated the applicable regulations by failing to "routinely test for tetrachloroethylene in the Royersford System" or by "not having installed such monitoring or testing" systems are questions

---

[17]     As explained below, relief cannot be granted for either claim. Talbert, the only plaintiff with any connection to PAWC, cannot invoke the NJCFA because his allegations bear no relationship to New Jersey. And the contract claims fail because Plaintiffs do not identify *any* contractual provisions that Defendants breached.

[18]     Plaintiffs acknowledge that the claim hinges on whether PAWC violated the drinking water regulations. *See* Pls.' Opp'n 23 n.18. And, as Defendants recognize, to the extent the claim seeks to impose on PAWC obligations *above and beyond* those regulations, that is even more reason to apply the primary jurisdiction doctrine. *See* Defs.' Mot. 23 ("Plaintiffs also assert that PAWC . . . must do additional sampling, at additional locations, and make disclosures beyond what federal, [and] Pennsylvania . . . regulations require. That implicates important policy considerations for PADEP . . . ."); *cf. Harshbarger*, 2014 WL 1409445, at *4 (applying primary jurisdiction doctrine where contract claims depended "on the application of [Pennsylvania statutes and regulations] to create an obligation that otherwise d[id] not expressly exist" in the contracts).

best left for the PADEP.  Am. Compl. ¶¶ 99–101.

For substantially the same reasons, Count III—but not Count I or Count II—is within the discretion of the PADEP.  *See* 35 PA. STAT. AND CONS. STAT. ANN. § 721.5(c) ("The [PADEP] shall have the power and its duties shall be to issue such orders and initiate such proceedings as may be necessary and appropriate for the enforcement of drinking water standards . . . ."); *Polites*, 928 A.2d at 391 ("Any matters affecting water quality . . . are within [the PADEP's] jurisdiction . . . .").

The third and fourth *Baykeeper* factors, however, weigh against application of the primary jurisdiction doctrine.  We are unaware of any prior applications to the PADEP, and there is no risk of inconsistent rulings because Defendants have "not pointed the court to any law or regulation that the [PA]DEP is capable of providing a remedy for a private citizen bringing a cause of action . . . for recovery of damages."  *Lloyd v. Covanta Plymouth Renewable Energy, LLC*, No. 20-4330, --- F. Supp. 3d ----, 2021 WL 365855, at *4 (E.D. Pa. Feb. 3, 2021).

On balance, the *Baykeeper* factors—particularly, the weighty first and second factors— indicate that we should defer to the primary jurisdiction of the PADEP on Count III.[19]  Counts I and II do not require the PADEP's input.

### ii.    Counts IV–V

PAWC contends that Counts IV and V should be stayed pending resolution of the PUC Proceeding.[20]  Defs.' Mot. 24–26.  We agree.  The *Baykeeper* factors clearly support that

---

[19]    This decision does not bar Plaintiffs from recovering damages: "[u]nder this bifurcated procedure, the issue of liability is transferred to, and initially decided by, the [PADEP].  If necessary, the appropriate trial court thereafter determines damages."  *MCI*, 71 F.3d at 1105 (citing *Elkin v. Bell Tel. Co. of Pa.*, 420 A.2d 371, 377 (Pa. 1980)).

[20]    In the alternative, PAWC asks that we dismiss (or stay) Counts IV and V because the PUC has "exclusive" jurisdiction over the claims.  *See* Defs.' Mot. 25.  This alternative argument rests on a faulty premise: the PUC does *not* have exclusive jurisdiction.  "[A]n administrative agency does not have exclusive jurisdiction unless it has the power to award relief that will make a successful litigant whole."  *State Farm Fire & Cas. Co. v. Jefferson*, No. 12-1107, 2013 WL 3784210, at *4

conclusion.

Counts IV and V are Talbert's "water hammer" claims, which both concern the "reasonableness, adequacy and sufficiency of PAWC's water service." Defs.' Mot. 25. The PUC "has long been recognized as the appropriate forum" for resolution of such issues. *Elkin*, 420 A.2d at 374. These claims also require interpretation of PAWC's PUC-approved tariff, a task that is "peculiarly within the expertise of the . . . [PUC]." *State Farm Fire & Cas. Co. v. Jefferson*, No. 12-1107, 2013 WL 3784210, at *2 (M.D. Pa. July 17, 2013) (quoting *Bell Tel. Co. of Pa. v. Uni Lite, Inc.*, 439 A.2d 763, 765 (Pa. Super. Ct. 1982)); *see also MCI*, 71 F.3d at 1105 ("The agency that can best determine [a utility's] compliance with that tariff is the PUC."). Accordingly, the first two *Baykeeper* factors support application of the primary jurisdiction doctrine.

The remaining *Baykeeper* factors point to the same outcome. PAWC has already applied to the PUC, and any rulings we render may conflict with those issued in the PUC Proceeding. *See, e.g.*, *Ferrare*, 2015 WL 3622883, at *4 ("Any court or jury determination . . . could conflict with a PUC ruling on the same issue."). As a result, the third and fourth *Baykeeper* factors weigh heavily in favor of applying the primary jurisdiction doctrine.

Overall, the *Baykeeper* factors indicate that we should defer to the primary jurisdiction of the PUC on Counts IV and V.

### D.     Failure to State a Claim

We now return to Counts I and II (as against PAWC). Both fail to state a claim upon which relief can be granted.

Rule 12(b)(6) governs motions to dismiss for failure to state a claim upon which relief can

---

n.4 (M.D. Pa. July 17, 2013) (quoting *Pettko v. Pa. Am. Water Co.*, 39 A.3d 473, 484 (Pa. Commw. Ct. 2012)). The Commission cannot make Plaintiffs whole because it cannot award money damages. *See id.* Therefore, it lacks exclusive jurisdiction.

be granted. To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) ("Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." (internal quotation marks and citations omitted)).

Under the 12(b)(6) framework, we first identify "the elements [the] plaintiff must plead to state a claim." *Connelly*, 809 F.3d at 787 (internal quotation marks and citation omitted). We then "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (internal quotation marks and citation omitted). Finally, we assume the veracity of well-pleaded factual allegations and "then determine whether they plausibly give rise to an entitlement to relief." *Id.* (internal quotation marks and citation omitted).[21]

The first claim against PAWC arises under the NJCFA. To state an NJCFA claim, a plaintiff must allege: "(1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." *Torres-Hernandez v. CVT Prepaid Sols., Inc.*, No. 3:08-cv-1057, 2008 WL 5381227, at *5 (D.N.J. Dec. 17, 2008) (internal quotation marks and citation omitted).

The problem, here, is that Talbert, the only plaintiff with any connection to PAWC, cannot invoke that statute because he is a Pennsylvania resident whose claims bear no relationship to New Jersey. *See, e.g.*, *Nirmul v. BMW of N. Am., LLC*, No. 10-cv-5586, 2011 WL 5195801, at *5 (D.N.J. Oct. 31, 2011) (holding that plaintiffs "are not entitled to sue under NJCFA because the

---

[21]     In performing this analysis, we "construe the complaint in the light most favorable to the plaintiff." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (internal quotation marks and citation omitted).

transactions in question . . . bear no relationship to New Jersey"); *Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250, 255 (3d Cir. 2010) (same). Simply put, there is no basis to apply the NJCFA against PAWC.[22]

The second claim against PAWC asserts breach of contract.[23] "It is well-established that three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016) (citing *J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc.*, 792 A.2d 1269, 1272 (Pa. Super. Ct. 2002)). "While not every term of a contract must be stated in complete detail, every element must be specifically pleaded." *Byrne v. Cleveland Clinic*, 684 F. Supp. 2d 641, 658 n.20 (E.D. Pa. 2010) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

"As Defendants correctly state, the complaint does not attach any contract or identify any essential terms of a contract." *Blazevich v. Star Hotels*, No. 3:19-cv-198, 2021 WL 1214688, at *10 (W.D. Pa. Mar. 31, 2021). Instead, it alleges that Plaintiffs "entered into contracts in the possession of Defendants" and that "Defendants owe the duty of care" under those contracts. Am. Compl. ¶¶ 94–96. These conclusory allegations do not "point to any specific and definite contract terms that were violated in [t]his case." *Utah v. Strayer Univ.*, 667 F. App'x 370, 371 (3d Cir. 2016). For that reason, we cannot draw a plausible inference that PAWC is liable for breach of contract. *See id.*; *see also David v. Neumann Univ.*, 187 F. Supp. 3d 554, 559 (E.D. Pa. 2016) ("Plaintiff has failed to

---

[22] This claim is dismissed with prejudice because any amendment would be futile. *See Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000).

[23] The parties apparently agree that Pennsylvania law governs this claim. *See* Defs.' Mot. 18; Pls.' Opp'n 24.

state a cause of action for breach of contract, because she has failed to specifically identify the terms of a contract in dispute or the [defendant's] breach thereof.").  Thus, we will dismiss Count II.[24]

### E.     Motion to Strike

Given our decision to stay the remainder of this case under the primary jurisdiction doctrine, we will deny Defendants' request to strike the class allegations without prejudice for Defendants to renew the request once the stay is lifted.

## III.     CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss are granted in part and denied in part.  An appropriate order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge

---

[24]     This claim is dismissed with prejudice because any amendment would be futile.  *See Alvin*, 227 F.3d at 121.  As Defendants note, "[d]espite *multiple opportunities*, plaintiffs fail to identify any contractual provision that defendants have breached."  Defs.' Reply 3, ECF No. 21 (emphasis added).